Filed 12/17/20  P. v. DeHerrera CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CHRISTOPHER DEHERRERA,<br><br>        Defendant and Appellant. | A159508<br><br>(Del Norte County<br>Super. Ct. No. CRPB19-5034) |

Defendant Christopher DeHerrera appeals following a jury trial convicting him of possession of contraband in prison.

Defendant's court-appointed counsel has filed a brief asking this court for an independent review of the record under *People v. Wende* (1979) 25 Cal.3d 436.  Defendant was informed of his right to file supplemental briefing and has not filed such a brief.  We have reviewed counsel's brief and independently reviewed the record, and we find no errors or other issues requiring further briefing.  Accordingly, we affirm.

**BACKGROUND**

On July 11, 2019, the Del Norte County District Attorney filed a single-count information charging defendant with possessing a device, contrivance, or instrument intended to be used for the unlawful injection and consumption of controlled substances while in Pelican Bay State Prison in violation of

1

Penal Code[1] section 4573.6, subdivision (a). It was also alleged that defendant had a prior serious or violent felony conviction (§ 667, subd. (b)-(i)) and served a prior prison term (§ 667.5). On July 25, defendant entered a plea of not guilty.

The prosecution moved for an order providing for physical restraints of defendant, defendant objected, and the trial court ordered that defendant be restrained with leg and waist restraints. The court granted defense counsel's request for defendant to be dressed in civilian clothing during the jury trial.

The prosecution filed motions in limine seeking (1) to admit in the case in chief evidence that defendant previously pleaded guilty at a rules violation hearing to possession of drug paraphernalia, specifically a hypodermic syringe and needle possessed in December 2016, (2) to exclude defense inmate witnesses proffered to discuss prison tattoos,[2] and (3) if the inmate witnesses were not excluded initially, to conduct a hearing under Evidence Code section 402 (402 hearing) regarding the inmates' personal knowledge. The trial court denied the prosecution's first two motions. The court initially agreed to a 402 hearing, but during trial, it decided such a hearing was unnecessary. The prosecutor also asked to exclude any reference to a urinalysis of defendant and the results, and the court denied this request.

Defense counsel made an oral motion to exclude defendant's statement to a nurse that he had injected drugs a week before the incident at issue. Defense counsel told the court that an officer advised defendant of his *Miranda*[3] rights and defendant indicated he wished to exercise his right to

---

[1] Further undesignated statutory references are to the Penal Code.

[2] As will be seen, the defense was that the needle found on defendant's person was intended to be used for tattooing, not injecting drugs.

[3] *Miranda v. Arizona* (1966) 384 U.S. 346 (*Miranda*).

remain silent. Defendant was then taken to a nurse who asked him about needle marks, and defendant stated he injected a week earlier. Defense counsel argued defendant "should have been re-Mirandized at that point." The prosecutor responded that when defendant was with the nurse for a medical examination, he was not "in custody any further than he normally would have been" and "[t]here [was] no interrogation." The court indicated that it would deny the motion, provided the prosecutor established that the medical exam occurred as she described and was not, for example, conducted in a holding cage.

A jury trial began September 23, 2019.

*Prosecution's Case*

Pelican Bay State Prison correctional officer Derek Trone testified he conducted a random search of defendant's cell on January 10, 2019. When Trone asked defendant if he had anything sharp or any contraband on him, defendant responded that he had a needle in the front of his boxer shorts. At that point, Trone placed defendant in handcuffs and took him to the "hobby shop," an area separate from the housing unit, which could be secured.

Trone removed an item from a pocket in defendant's boxers. Based on his training and experience, Trone believed the item was a "hype kit" for drug use. He described the components of the item as a needle with a "plastic overlay . . . like a modified plunger," some type of fabric used as a filter for the liquid to be injected, a clear plastic barrel like part of a Bic writing pen, and some black rubber used as a bulb to draw in and expel fluid. The needle itself was a hypodermic needle, meaning it was hollow. Trone agreed the contrivance, "[k]ind of like a turkey baster," would be considered "an inmate-manufactured hypodermic syringe and needle." A hypodermic needle is

3

considered a commodity among inmates and can be shared by many inmates for using drugs.

Trone noticed reddened, raised, and bruised areas on defendant's arms "between his forearm and biceps" that appeared to be recent injection sites.

Trone has seen more than 100 "tattoo guns" in Pelican Bay State Prison. None of them had hypodermic needles. He was not familiar with the "stick and poke" method of tattooing. In Trone's experience, the needle used in a tattoo kit is solid, like a paper clip, not hollow. He testified the item found on defendant was not consistent with a tattoo gun in that it did not have a solid needle, there was no ink in the barrel, and it lacked wires and a platform for a motor.

On cross-examination, Trone testified that prison tattoos are extremely common in the inmate population even though both possession of tattoo paraphernalia and the act of tattooing are serious rule violations in the prison. He did not observe any signs that defendant was under the influence of a controlled substance the day of the search. Defendant was given a urinalysis, and Trone was not aware of any discipline resulting from the test. He was not aware of drugs ever having been found in defendant's cell.

Officer Eric Burr, an evidence technician, opined that the item found in defendant's boxers was an inmate-manufactured hypodermic kit. He has seen many tattoo guns, and hype kits are different from tattoo guns. He has never seen a stick and poke tattoo kit in prison. Burr has never seen a hypodermic needle used in a tattoo kit.

Lu-Anne Cobb, a licensed vocational nurse at Pelican Bay State Prison, testified that when an inmate is caught with contraband, she exams the

inmate in the hobby shop[4] and fills out a 7219 form. The purpose of the exam is "to verify the condition or the status of the inmate's body prior to being transferred to another unit or returned back to his house." When conducting such an exam, she does not know what kind of contraband was found on the inmate.

Cobb examined defendant on the day his cell was searched and noted puncture marks on the insides of his arms, which usually indicates intravenous drug use. She felt defendant's arms and did not feel anything raised, which indicated the marks were older injection sites. Cobb testified she asked defendant when he used last and he responded, "last week was the last time."[5] As Cobb was leaving the hobby shop, defendant called her over and told her she did not need to report his statement and said he was diabetic. Cobb told him he was not, which she knew because she was the medications nurse for his housing unit and knew which inmates were diabetic.

On cross-examination, Cobb testified that she did not consider defendant her patient that day because he "wasn't requiring medical and [she] was there to do a custody form." The purpose of the exam was to "document injuries or anything unusual." The 7219 form does not go in the inmate's medical file. Defendant was not restrained during the exam, and

---

[4] Cobb testified there is a holding cell about the size of a telephone booth in the hobby shop, but her examinations do not take place there. There was no further discussion about defendant's motion to exclude his statement to Cobb, but the fact the exam was not in a "cage" presumably satisfied the court that defendant' statement to Cobb was admissible.

[5] Cobb testified it was unusual for an inmate to give a statement as defendant did. It was very common for inmates to refuse to answer or make no comment.

5

custody staff were present. Cobb testified that if an inmate appeared to be under the influence of drugs, she probably would not report it in the 7219 form because her purpose in such an exam is "to inspect his body."

Without objection, evidence was presented of defendant's prior convictions in Los Angeles County of grand theft in 1995 and murder in 1998.

*Defense*

Defense witness George Pineda was in prison for carjacking and robbery. He testified defendant was his cellmate in January 2019. Pineda has prison tattoos that were done using two different methods, "[a] motor and a pick." He testified a pick tattoo can be done with a "syringe from a needle." He considers defendant a good tattoo artist, and he wanted defendant to fix a tattoo on his leg.[6] Pineda never saw defendant use drugs. He testified the item found in defendant's boxers could be used to pick tattoos or inject drugs.

Inmate Ignacio Ruis, Jr., has some prison tattoos, and he has seen others receive tattoos in prison. He described two different methods of prison tattooing as "machine" and "picking." Ruis has two tattoos made using the picking method. He opined the item found in defendant's boxers would be "perfect" for picking "because it has a barrel, has the needle, has the binky [the rubber part at the end] and you can pour the ink in there. It is a pretty good instrument for tattooing." Ruis testified that prisoners trade services for things (toiletries, food) or other services, and tattooing is one of the services that could be traded. He testified he never used intravenous drugs and indicated he had never seen a hype kit, so he did not know whether the item found in defendant's boxers could be used to inject drugs.

Defense counsel chose not to call his third proposed inmate witness.

---

[6] Pineda explained that he did not get a tattoo from defendant because he (Pineda) left the prison for months for a court case.

Before defendant testified, the court ruled that if he did testify, the prosecutor would be permitted to raise defendant's prior rule violation for possession of drug paraphernalia in December 2016 (evidence of which the prosecution was not allowed to present in its case in chief).

Defendant testified he was 42 years old, he had been incarcerated since he was 20 years old for murder and grand theft, and he had not been convicted of any crimes in prison. He has about 25 tattoos; most of them he got in prison. Tattoo paraphernalia is not allowed in prison, but defendant testified, "We make our tattoo equipment." He trades his tattoo services in the prison underground economy. He estimated he tattooed around 100 prisoners. His specialty is picking. He described the parts of the item found in his boxers and how he would use it to tattoo.

Defendant testified the item found in his boxers was a tattoo kit he put together the night before the search and he intended to use it to tattoo his cellmate Pineda that day. He did not intend the item to be used for injecting drugs. He submitted to a drug test "with no hesitation." He was not forced to tell nurse Cobb that he used drugs a week earlier; he was being honest with her. Defendant denied telling Cobb not to write down that he used drugs or that he was diabetic. There were about five correctional officers present during the medical exam with Cobb. Defendant admitted he had needle marks on his arms when he saw Cobb. He did not use drugs "that much," he was not an addict, and the marks on his arms were not caused by the item found in his boxers. He testified he has never had a positive drug test in prison.

On cross-examination, defendant admitted he was a documented Sureño gang member. He would not say whether Ruis or Pineda was a gang member. He agreed the item found in his boxers could be used to inject

7

drugs. Since 2000, he has had 15 rule violations in prison. He pleaded guilty to a rule violation for possession of drug paraphernalia based on a hypodermic needle found in his cell in December 2016. On redirect, defendant explained he would be found in violation of the rule regardless of his intended use for the hypodermic needle found in December 2016 and that he pleaded guilty so he would be treated more leniently.

The prosecution called Lieutenant Mathew Bristow in rebuttal. He conducts rules violation hearings at Pelican Bay State Prison and testified about the hearing regarding drug paraphernalia found in defendant's cell in December 2016. He confirmed that defendant entered a guilty plea in that matter. Defendant made no statement and presented no evidence at the hearing.

On cross-examination, Bristow testified the inmate's intended use of a hypodermic needle would not matter.[7] He agreed that some hearing officers may treat an inmate who pleads guilty more leniently. The burden of proof at a rules violation hearing is preponderance of the evidence.

The prosecution also called a Pelican Bay State Prison correctional officer who had been a tattoo artist. She testified she was familiar with the stick and poke method, and a hypodermic needle would not be used for either stick and poke or machine tattooing. She testified a hollow needle with a syringe would not work because "if you are to poke the skin with a hype kit

---

[7] It also came out in cross that the matter of the hypodermic needle found in defendant's cell in December 2016 was referred to the district attorney and the resulting criminal case was dismissed "in the furtherance of justice." Bristow testified this did not affect the rules violation hearing because "We have a completely different standard for guilty or not guilty than the court system has."

and even use a plunger, what is going to happen [is] it's going to blow out the lines and create a blob."

Defense counsel and the prosecutor agreed to all the jury instructions.

In his closing, defense counsel argued the prosecution had to prove the object found in defendant's boxers was "intended to inject or consume controlled substances in a penal institution," but the evidence here was that defendant made the object with the intent to use it to tattoo.

The jury began deliberations at 5:01 p.m. on September 25, 2019, and returned a verdict at 6:03 p.m. The jury found defendant guilty as charged and found the prior allegations true.

The probation officer recommended the middle term of three years for the section 4573.6 violation, doubled due to the prior "strike" conviction, plus one year for the prior prison term for a total term of seven years to be served consecutive to his current sentence. Defense counsel filed a motion to strike the prior convictions, arguing the trend in the law was to treat personal drug crimes more leniently. The prosecution filed an opposition to the motion to strike.

At sentencing on January 23, 2020, the trial court heard argument and stated it considered defendant's motion and the opposition. The court found the circumstances "within the parameters of three strikes" and denied the motion to strike the murder conviction for sentencing purposes. The court found the circumstances in aggravation and mitigation balanced out and imposed the middle term, which was doubled because of the "strike" conviction. The court struck the prison prior "due to operation of new law." The court imposed and stayed a restitution fine of $300 and imposed $70 in assessments.

## DISCUSSION

We have reviewed the record on appeal for any arguable issues. The trial court properly denied the motion to suppress defendant's statement to Cobb that he had injected a week earlier. (See *People v. Andreasen* (2013) 214 Cal.App.4th 70, 87 ["routine or casual communications," such as routine booking questions or a question related to medical condition, are excluded from *Miranda* "even when a defendant has already received *Miranda* warnings and invoked his or her rights"]; *People v. Salinas* (1982) 131 Cal.App.3d 925, 937–943 [no *Miranda* warning required where a doctor took medical history and there was no evidence the doctor was attempting to secure evidence as an agent of law enforcement].) Moreover, we discern no prejudice given that two witnesses testified defendant had marks on his arms indicating injection sites and defendant's statement was admissible for impeachment purposes once defendant chose to testify.[8] (*People v. Cannata* (2015) 233 Cal.App.4th 1113, 1121.)

Based on our review of the record, defendant was represented by competent counsel who acted to protect his rights and interests.

The sentence imposed is authorized by law.

We conclude there are no arguable issues within the meaning of *People v. Wende, supra,* 25 Cal.3d 436.

## DISPOSITION

The judgment is affirmed.

---

[8] The defense that defendant did not intend to use the item found in his boxers to inject drugs would have undoubtedly failed without his testimony on his subjective intent, given that every witness with knowledge of hype kits testified that the item could be used to inject drugs.

_____

Miller, J.

WE CONCUR:

_____

Richman, Acting P.J.

_____

Stewart, J.

A159508, *People v. DeHerrera*

11